# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF IOWA

In the Matter of:

| | |
|---|---|
| Jason Joseph Villalobos,<br>Darcy Danielle Villalobos, | Case No. 10-00347-als7 |
| Debtors | Chapter 7 |
| Bank Iowa – West Des Moines, | Adv. Pro. 10-30071-als |
| Plaintiff | |
| v. | |
| Jason Joseph Villalobos, | |
| Defendant | |

**MEMORANDUM OF DECISION**
**(date entered on docket: November 9, 2011)**

<u>COURSE OF PROCEEDING</u>

Bank Iowa ("Bank" or "Plaintiff") filed this adversary proceeding pursuant to 11 U.S.C. section 523(a)(2) to contest the dischargeability of obligations owing to it by the Debtor which arise under his personal guaranties of business debts. Trial was conducted on August 30, 2011. The Bank was represented by its counsel John M. Bouslog and Michael S. Eganhouse. Jason Villalobos ("Debtor," "Defendant" or "Villalobos") was represented by Donald F. Neiman and Chet A. Mellama. The matter is now fully submitted. Jurisdiction of these matters is found at 28 U.S.C. sections 157(b)(1) and 1334. Upon review of the evidence and the parties' briefs, the following findings and conclusions of law are entered pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. For the reasons set forth herein, the objections to dischargeability are denied, and the complaint is dismissed.

## FACTS

Villalobos filed a joint voluntary chapter 7 petition on February 1, 2010. Debtor is a chiropractor by profession and operates Warren County Chiropractic. Prior to his filing, the Debtor became involved in several real estate investments. One such investment is Blake Group LLC, which owns and operates a five-unit rental property in Des Moines, Iowa, and is jointly owned by the Debtor and his wife. The Debtor also holds a minority interest in Aqueous Management Group ("Aqueous") which owns and operates three apartment complexes in central Iowa. In March 2006, Aqueous obtained a loan from Valley Bank which was guaranteed by Villalobos. In May 2006, David Fegley ("Fegley") assisted the Debtor in obtaining a loan involving Aqueous and Clark County State Bank. This loan was also guaranteed by the Debtor. Fegley then approached the Debtor about other investment opportunities. These contacts resulted in the Debtor's ownership of a twenty-five percent (25%) interest in University Plaza LLC aka Clive Car Wash ("University Plaza") and a thirty-three percent (33%) ownership interest in Green Horizons Properties, LLC ("Green Horizons").

At issue in this case are loans that were made by the Bank to University Plaza and Green Horizons which were guaranteed by the Defendant.[1] Due to his relationship with the Bank, Fegley managed the introduction and referral of the parties for the first loan which involved University Plaza ("University Plaza Loan"). Theresa Allsup ("Allsup") was the Commercial Banker and primary contact handling the matter on behalf of the Plaintiff. During the due diligence phase of the loan process, financial information about the Defendant and his business entities was supplied to the Bank. These items were then forwarded by Allsup to the Bank's credit analyst for review in calculating a risk rating for the loan. Risk ratings range from one (1),

---

[1] Copies of the guaranties were not admitted into evidence; however, there appears to be no dispute that the Defendant executed personal guaranties in favor of the Bank on these two loans.

the least risk, to eight (8), the highest risk. The Bank's lending procedure includes the preparation of a written loan presentation which contains relevant financial information and the assigned risk rating. The majority of the loans in the Bank's portfolio are rated three (3) or four (4).[2] A rating of four (4) indicates that there is an above average credit risk. According to the Bank, not all loans receiving a risk rating of four (4) are approved.

At some time during the parties' negotiations on the University Plaza Loan, the Bank initiated contact with the Corporation for Economic Development for Des Moines ("CED") regarding its interest and ability to contribute financing on the University Plaza transaction. The Bank believed that such third party participation was positive and would further solidify its lending position. The CED determined that funds were available through the United States Small Business Administration's ("SBA") 504 Program, and Terrence Vorbrich ("Vorbrich") joined the ongoing process on behalf of these lenders. The Bank and CED regularly exchanged financial information that each received related to the University Plaza Loan.

In connection with the loan application for University Plaza, the Defendant supplied personal financial statements to the lenders. A financial statement dated May 25, 2006 and executed by Jason Villalobos was provided to the Bank. An identical statement with the same date, executed by both Jason and Darcy Villalobos was provided to the CED. The Defendant's guaranties on the Aqueous loans involving Valley Bank and Clarke County State Bank were not identified on these financial statements. Prior to approval of the University Plaza Loan, but after submission of his financial statements, the Defendant executed a third personal guaranty on a loan from US Bank to Warren County Chiropractic in the initial principal amount of $50,000.

---

[2] The Bank holds no loans with a risk rating of one (1). A rating of two (2) requires cash security such as a certificate of deposit. A rating of three (3) requires a stable cash flow, a low loan to value ratio and a financially strong guarantor. New lending is never approved if the risk rating exceeds four (4).

The University Plaza Loan was approved by the Plaintiff with a risk rating of four (4). Pursuant to a promissory note dated July 13, 2006, University Plaza borrowed One Million Three Hundred Thirty Five Thousand Two Hundred Dollars ($1,335,200) from Bank Iowa. Collateral for this note included an Open-End Real Estate Mortgage on real estate identified as the Clive Car Wash. As evidenced by a promissory note, involving both the SBA and the CED, dated November 2, 2006, University Plaza obtained another loan in the amount of Four Hundred Ninety One Thousand Dollars ($491,000). As required under the 504 Program, this loan was collateralized by a second mortgage position on the Clive Car Wash. It is undisputed that the Defendant guaranteed both of these loans.

The second loan at issue involves Green Horizons ("Green Horizons Loan"). With the exception of Vorbrich (on behalf of the CED/SBA) the same individuals were involved in the negotiation of this loan. It is unclear from the record whether identical protocols were followed for the lending on Green Horizons because of the due diligence previously performed for the University Plaza Loan. A personal financial statement dated November 24, 2006, and executed by the Debtor on January 25, 2007, was submitted to the Bank on the Green Horizons Loan. The contingent liabilities to Valley Bank, Clark County State Bank, US Bank, the CED/SBA and the Plaintiff were not set forth on this personal financial statement. The Green Horizons Loan was also approved with a risk rating of four (4). Pursuant to an original promissory note dated July 9, 2007, Green Horizons borrowed One Million Eight Hundred Forty Thousand Dollars ($1,840,000). As collateral for the loan, Green Horizons executed an Open-End Real Estate Mortgage on certain real estate.

Issues affecting University Plaza's business operations began approximately six to eight months after its loan was approved. A long-term construction project began on the street in

front of the business which limited access to the car wash.  This situation severely affected cash flow.  The Defendant readily states that the Bank worked with him during this difficult time period.  However, even with the Bank's cooperation and other monetary resources being utilized, it became impossible to continue operations and make the loan payments.  Due to the downturn of the economy and real estate market, Green Horizons also had problems in meeting its loan obligation.  Payments were made on this loan by the Defendant up until the time he filed bankruptcy.  The Bank pursued its remedies of default and foreclosure against both entities.  At the time of trial, the collateral for the Bank's loans had been sold leaving deficiencies in the amounts of $277,777.52 on the University Plaza Loan and $1,068,703.79 on the Green Horizons Loan.

## DISCUSSION

The Bank seeks to have the obligation owing under the personal guaranties signed by the Debtor excepted from discharge under 11 U.S.C. sections 523(a)(2)(A) and 523(a)(2)(B).  To succeed, a plaintiff must prove the required elements by a preponderance of the evidence.  See First Nat'l Bank v. Pontow, 111 F.3d 604, 608 (8th Cir. 1997); Merchs. Nat'l Bank v. Moen (In re Moen), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999).  Under either 523(a)(2)(A) or 523(a)(2)(B), the Defendant must have obtained money or credit in connection with the false information.  See 11 U.S.C. § 523(a)(2)(A)-(B) (2011); Am. Bank of Commerce v. Powell (In re Powell), 423 B.R. 201, 210 (Bankr. N.D. Tex. 2010).

    I       11 U.S.C. section 523(a)(2)(B) (Count II)

The focus of the Bank's case is that Villalobos misrepresented his financial condition by failing to include his personal guaranties of various business loans involving other business ventures on the written financial statements he provided in connection with the University Plaza

and Green Horizons Loans. These allegations will be considered first. Under the Bankruptcy Code:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by . . . use of a statement in writing – (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive.

11. U.S.C. § 523(a)(2)(B) (2011).

"A written statement is materially false if it paints a substantially untruthful picture of the debtor's financial condition by misrepresenting information that would normally affect the lender's decision to extend credit." Northland Nat'l Bank v. Lindsey (In re Lindsey), No. 10-6045, 2011 WL 383735, at *2 (B.A.P. 8th Cir. Feb. 8, 2011) (citing Premier Bank v. Koester (In re Koester), 437 B.R. 363, 368 (Bankr. E.D. Mo. 2010)). The Defendant's written financial statement was false because it did not include his contingent liabilities. Similarly, the Plaintiff met its burden to show that the omission of the contingent liabilities was material by establishing that such information typically affects the Bank's decision to lend money. The first two elements required by the statute have been satisfied.

The Bank must also show that the Defendant intended to deceive it by providing a false personal financial statement.

> Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred. When the creditor introduces circumstantial evidence proving the debtor's intent to deceive, the debtor "cannot overcome [that] inference with an unsupported assertion of honest intent." The focus is, then, on whether the debtor's actions "appear so

> inconsistent with [his] self-serving statement of intent that the proof leads the court to disbelieve the debtor."

In re Lindsey, 2011 WL 383735, at *4 (citations omitted). Villalobos testified that he did not intend to deceive the Bank. Because of the value of his business interests, he viewed those as assets rather than liabilities. He further stated that he did not realize the meaning of a contingent liability. The Bank urges a finding that the Defendant is a sophisticated businessman who knew he needed to disclose his guaranties for other business loans. While the Defendant operated a successful medical business, this does not, by default, qualify him as a sophisticated investor in car washes and real estate. According to the record, the Defendant was solicited to enter into the investments by Fegley, a consultant who had an established relationship with the Bank. Villalobos testified that he relied upon Fegley and others to prepare and provide financial information to the Bank, which calls into question whether the Defendant actually made any representation regarding his finances, let alone with the intent to deceive.

Witnesses testified that all requested information about the Defendant's other business entities was supplied. During the University Plaza Loan process it also appears that information about Aqueous was considered based upon its separately submitted financial information. Allsup stated that she relied solely upon the personal financial statement for contingent liability information. She further testified that she would have forwarded copies of the guaranties to the credit analyst if they had been received.[3] Even though the Bank had knowledge of the Defendant's guaranty on the University Plaza Loan, and presumably of the CED/SBA guaranty, these were not contained or referenced in the loan presentation for Green Horizons. Consequently, the conclusion urged by the Plaintiff that the only source of information for contingent obligations is the personal financial statement is not consistent with the Bank's

---

[3] To the extent the Bank was aware and had knowledge of the personal guaranties, the necessity of an actual copy of the guaranties becomes superfluous. See discussion under Section II.

practice. In this case, the personal financial statement, standing alone, is insufficient to show the Defendant's intent to deceive the Bank. The record establishes that Villalobos lacked the intent to deceive.

Even if there was a materially false writing made with the intent to deceive, the Bank must also prove that it relied on the written statement. Such reliance must be reasonable to satisfy this element.

> "The reasonableness of a creditor's reliance . . . should be judged in light of the totality of the circumstances." Among other things, a court may consider "whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations."

Sinclair Oil Corp. v. Jones (In re Jones), 31 F.3d 659, 662 (8th Cir. 1994) (citing Coston v. Bank of Malvern (In re Coston), 991 F.2d 257, 261 (5th Cir. 1993)). In determining whether reliance is reasonable:

> [A] person is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. . . . [I]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.

Willens v. Bones (In re Bones), 395 B.R. 407, 432 (Bankr. E.D. Mich. 2008) (citing Field v. Mans, 516 U.S. 59, 70-71 (1995)).

The Bank's representatives testified that the Debtor's financial statements did not contain anything suspicious that would suggest the need for further investigation. I disagree. Both

financial statements identified the Defendant's involvement in other ventures.[4] It is undisputed that the Bank was involved in discussions about the Defendant's businesses. John Hart, Executive Vice President and Senior Lending Officer for the Bank ("Hart"), testified that even though a borrower lists no contingent liabilities on his financial statement, it would not be unusual for this information to be provided outside of a formal document during a conversation about a prospective loan. As such, the meetings and separate financial documentation provided for the business entities should have raised a red flag for the Bank prompting a more detailed inquiry into the Defendant's personal obligations if such information was lacking. Vorbrich concluded that the Defendant had other contingent liabilities even though his financial statement contained no specific listing of them. Further, Allsup had personal knowledge of Warren County Chiropractic due to her involvement in transactions with Villalobos during her employment with US Bank.

It is not uncommon for lenders to obtain personal guaranties to secure business obligations.[5] The open question is the extent to which a lender believes it will need to seek repayment of the loan under the personal guaranties. Similar to the determination of a defendant's intent to deceive, the circumstances surrounding a transaction can be examined to draw inferences as to the reliance placed upon a specific payment source to service the loan. In contrast to the reference to the SBA guarantee in the loan presentation for University Plaza, there is no identification of Vilallobos' guaranty as a "strength" for this loan. In both loan presentation documents, the cash flow of the businesses were identified as the primary source for debt service. Due to factors outside of the parties' control, the anticipated cash flow projections did not materialize. If the Bank could have predicted these future and unfortunate developments

---

[4] Apartment with Mick Page, a car wash, 3 apartment houses and 2 houses - 50% partner. Exhibits 17, 20 and 21.
[5] A personal guaranty may be obtained even when a guarantor would not have the financial ability to repay the obligation upon default by the borrower.

at the time of the loan application, it is probable that it would have declined to approve the loan, even if the contingent liabilities had been set forth on the Defendant's personal financial statement.

The Plaintiff argues that it would not have made the loans if the contingent liabilities had been disclosed on the personal financial statement. In hindsight, this is no doubt a true statement. Notwithstanding this argument, nothing in the record suggests that the Defendant's contingent liabilities related to Aqueous were the cause of the defaults under the University Plaza or Green Horizons Loans, or his bankruptcy filing. Furthermore, the personal financial statement also omitted an asset valuation for the Defendant's interest in Aqueous.

The loan process involving University Plaza, Green Horizons and the Defendant did not occur in a vacuum. After considering the dealings of the parties, the sole emphasis that the Bank now places on the Defendant's omission of a specific listing of contingent liabilities is not persuasive. It is unrealistic to conclude that the Bank relied solely on the personal financial statement to the exclusion of all other information, and even if it did, its reliance was not reasonable under the circumstances.

II      11 U.S.C. section 523(a)(2)(A ) (Count I)[6]

11 U.S.C. section 523(a)(2)(A) (2011) provides that:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by – false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

---

[6] A review of the Complaint and evidence reveals that the primary focus of the Bank's case relies upon the Debtor's written financial statements. These are specifically excepted from section 523(a)(2)(A). See Barclays Am./Bus. Credit v. Long (In re Long), 774 F.2d 875, 877 n. 1 (8th Cir. 1985). Both briefs present arguments pursuant to 523(a)(2)(A), although it is not clear that the facts relied upon by the parties are different from those presented in support of their arguments under 523(a)(2)(B). Analysis of this Count will be confined to the evidence that does not arise from the written financial statement. Any argument related to the failure to disclose or supplement the written financial statement is addressed in section I.

In order to prove actual fraud, a creditor bears the burden of proof on the following elements: 1) that the debtor made a representation; 2) that at the time the debtor knew the representation was false; 3) that the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor; 4) that the creditor justifiably relied on such representation; and 5) that the creditor sustained the alleged loss and damage as the proximate result of the representation having been made.  Merchs. Nat'l Bank v. Moen (In re Moen), 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999) (citations omitted).  See also Marcusen v. Glen (In re Glen), 427 B.R. 488, 492 (B.A.P. 8th Cir. 2010).

The parties met on numerous occasions to discuss the details of the loans and gather information.  These meetings were attended by various individuals, and generally included representatives from the Bank and the CED (for University Plaza Loan only), individuals involved in brokering the investment, the Defendant, and representatives that handled his finances and business interests.  Although Allsup does not recall whether specific guaranties were discussed during the meetings involving University Plaza, she could not state that it did not occur.  Vorbrich testified that according to his notes, the Defendant's financial obligations related to Aqueous were discussed at one of the meetings.

The Bank argues in its brief that the Defendant's silence as to his financial obligations and his failure to supplement the personal financial statement represents conduct that precludes discharge of its debt.  There is no proof that the Defendant remained silent as to his guaranties or that he engaged in any conduct to deliberately and intentionally deceive the Bank during the meetings.  Similarly, there is no proof that the Defendant attempted to conceal any interest he held in other business entities during these conversations with the Bank.

The Defendant's guaranty of the University Plaza loan was not contained in the Green Horizons loan presentation. To explain this omission, Hart stated that the Bank would have considered the guaranty given for the University Plaza Loan because it had knowledge of that transaction. To the extent mere knowledge of a contingent liability satisfies the Bank during the loan approval process, the record supports a finding that the Bank was aware of the Defendant's personal guaranties which negates its argument of justifiable reliance under a theory of a lack of disclosure.

## CONCLUSION

Dischargeability actions are narrowly and strictly construed against the creditor and in favor of the debtor. See Lipka v. Donley (In re Donley), 115 B.R. 502, 503 (Bankr. E.D. Pa. 1990) (citing Koltman v. Hammill (In re Hammill), 61 B.R. 555 (Bankr. E.D. Pa. 1986)); Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert), 141 F.3d 277, 281 (6th Cir.1998). Applying this standard, and based upon the reasons stated herein, the Plaintiff has not met its burden under all of the required elements of 11 U.S.C. sections 523(a)(2)(A) or (B).

IT IS THEREFORE ORDERED:

1. The objection to dischargeability pursuant to 11 U.S.C. section 523(a)(2)(A) is denied.

2. The objection to dischargeability pursuant to 11 U.S.C. section 523(a)(2)(B) is denied.

3. The complaint is dismissed.

4. The parties shall bear their own costs.

/s/ Anita L. Shodeen
Anita L. Shodeen
U.S. Bankruptcy Judge

Parties receiving this Memorandum of Decision from the Clerk of Court:
Electronic Filers in this Adversary Proceeding